

FILED
IN OPEN COURT

MAR 1 3 2019

CLERK, U.S. DISTRICT COURT
NEWPORT NEWS, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 4:19cr 30 |
| | ) | |
| v. | ) | FILED UNDER SEAL |
| | ) | |
| GREGORY J. ZIGLAR, | ) | 18 U.S.C. § 1014 |
| | ) | False Statements to Financial Institution |
| Defendant. | ) | (Counts 1 - 24) |
| | ) | |
| | ) | 18 U.S.C. § 1028A |
| | ) | Aggravated Identity Theft |
| | ) | (Counts 25 - 26) |
| | ) | |
| | ) | 18 U.S.C. § 1956(a)(1)(A)(i) |
| | ) | Promotional Money Laundering |
| | ) | (Counts 27 - 36) |
| | ) | |
| | ) | 18 U.S.C. §§ 981(a)(1)(C) & |
| | ) | 28 U.S.C. § 2461 |
| | ) | Criminal Forfeiture |

INDICTMENT

March 2019 Term – at Newport News, Virginia

GENERAL ALLEGATIONS

1.      At various times between May 2014 and June 2018, GREGORY J. ZIGLAR, the

defendant herein, ("ZIGLAR"), also using the aliases of "Brian James" and "Julian Brian James,"

solicited customers through newspaper and direct mail advertisements that offered home repair

services and assistance obtaining associated federally-insured financing.  ZIGLAR used multiple

business names, including: Dream Homes of Virginia, Equibates, Inc., Equitables International,

1

Residential Services of Virginia, Residential Services of Carolina, Professional Home Advisors, Hometek, and Home Services of Virginia, to solicit customers. Many of ZIGLAR's advertisements included statements that the loans could be used to consolidate bills, which was not a permitted use of the loan program.

2.    ZIGLAR used his personal residences as his principal office addresses. Initially, his office was located at 4821 Berrywood Road, Virginia Beach, Virginia, and later it was located at 4825 Berrywood Road, Virginia Beach, Virginia. ZIGLAR also opened and used two Post Office boxes in Virginia Beach, Virginia to transact business.

3.    Admirals Bank ("Admirals"), Providence, Rhode Island, and Home Loan Investment Bank ("HLIB"), Warwick, Rhode Island, are both financial institutions, as defined by Title 18, United States Code, Section 20, with deposits insured by the Federal Deposit Insurance Corporation.

4.    The Federal Housing Administration ("FHA") is an agency within the United States Department of Housing and Urban Development ("HUD"). FHA administers various mortgage insurance programs mandated by the National Housing Act, Title 12, United States Code, Section 1703. Under the Title I Property Improvement Loan Program, FHA insures loans made to borrowers for the purpose of financing alterations, repairs, and improvements to homes, including a manufactured home. The improvements must substantially protect or improve the basic livability or utility of the property.

5.    Under the Title I Property Improvement Loan Program, FHA does not make mortgage loans directly to borrowers, but, rather, encourages commercial lenders to make such loans to individual borrowers by insuring those loans in the event of default. In the event of default,

2

the lender will accelerate the mortgage and seek foreclosure, then file a claim with HUD. After filing a claim, HUD will pay up to 90 percent of the lender's loss. The lender's loss includes the outstanding principal balance and certain associated fees. Both Admirals and HLIB are approved to originate loans through the Title I Property Improvement Loan Program.

6.      Code of Federal Regulations (CFR) Title 24 § 201.10 limits the maximum loan amount for Title I loans to $25,000. Additionally, that regulation provides that the total principal obligation of the loan shall not exceed the actual cost of the project plus any applicable fees and charges.

7.      Upon meeting with prospective clients, many of whom were in their sixties or older, ZIGLAR, acting as James, advised that he could obtain financing for the clients' required home improvements and that all of the construction work would go through his approved contractors. Even though the client-borrowers had to pay loan origination fees and closing costs to the lender, ZIGLAR executed agreements with them, which typically stated that they would pay him $2,500 in exchange for referring them to a lender for financing. In relation to these agreements, borrowers usually paid ZIGLAR $1,250 up-front and the remainder once the loan closed. Regulations concerning the HUD Title I Loan Program promulgated in Title 24 CFR § 201.25(d) prohibit such payments. Title 24 CFR § 201.25(d) states:

> **Fees and charges that may not be paid.** Neither the lender nor the borrower may pay a referral fee to any dealer, home manufacturer, contractor, supplier, real estate broker, loan broker, or any other party in connection with the origination of a loan insured under this part.

8.      HUD requires a copy of the contract or contractor's price estimate as part of the loan approval process. Title 24 CFR § 201.20(b) states in pertinent part:

(1) The loan proceeds shall be used only for the purposes disclosed in the loan application. If the borrower plans to use a dealer or contractor to carry out the improvement work, the lender shall obtain a copy of a proposal or contract that describes in detail the work to be performed and the estimated or actual cost.

(2) The loan proceeds shall be used only to finance property improvements that substantially protect or improve the basic livability or utility of the property. The Secretary will establish a list of items and activities that may not be financed with the proceeds of any property improvement loan.

9.      To meet these requirements, ZIGLAR created fictitious agreements or contracts purportedly between the borrowers and contractors. The contracts showed work to be done on the borrowers' properties and a contract price. ZIGLAR sent the contracts, typically via facsimile, to Admirals or HLIB. ZIGLAR used four different contractor names and contractor's license numbers to execute the agreements: A.M.P. Construction ("A.M.P."), KTB Enterprises, LLC ("KTB"), Larry A. Jackson Construction ("Jackson"), and Key Mechanical, LLC ("Key"). ZIGLAR claimed to borrowers and lenders that he represented the contractors. ZIGLAR typically inflated the amounts of the contracts, so that the borrowers would receive the maximum loan amount, thereby maximizing his proceeds from the scheme.

10.     The owners of A.M.P., KTB, Jackson, and Key did not give ZIGLAR authorization to execute contracts on their behalf. In fact, that authority could not be delegated, even if the contractors wished to do so. Regulations located at Title 18, Agency 50, Chapter 22, Section 260 of the Virginia Administrative Code prohibit contractors from allowing a firm's license to be used by another. A review of the contractor's license applications for A.M.P., KTB, Jackson, and Key revealed that ZIGLAR was not an officer, member of responsible management, designated employee, or qualified individual of any of the businesses.

4

11.     Once the loans were approved, the loan proceeds were wired into the borrowers' bank accounts. Upon receipt of the loan proceeds, the borrowers generally paid ZIGLAR the entire amount of the loan proceeds up-front. ZIGLAR then hired contractors to perform work to the borrowers' homes and paid them substantially less than the agreement submitted to the lenders. Often times, the amount ZIGLAR paid to the contractors approximated 50 percent or less than the amount he received. ZIGLAR kept the remaining funds, which he used to pay unrelated personal expenses. In some instances, the contractors performed little to no work. In instances where work was performed, the work was often shoddy and incomplete, leaving the properties in a worse condition than before the homeowners contacted ZIGLAR. The issues went unresolved because once ZIGLAR received the money, he became unresponsive to the homeowners' attempts to contact him.

### *Property on Hoover Avenue in Chesapeake, Virginia*

12.     On or about May 7, 2014, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowner, P.S., to HLIB. The contract stated that A.M.P. would perform the following to the home: install new cabinets, a new countertop, and vinyl floor covering, and paint in the kitchen; and install a new two-piece tub and shower unit, new fixtures, a new toilet, new upper and lower cabinets, vinyl floor covering, and paint in the bathroom. The total contract price was $14,980.00. On or about May 27, 2014, HLIB wired $14,980.75 into P.S.'s bank account, which represented proceeds of the loan. A "Contractor Acceptance Agreement" dated May 19, 2014, was executed between A.M.P. and Residential Services of America for work to the home on Hoover Avenue. According to the agreement, A.M.P. was to perform the work stated in the A.M.P. contract submitted to HLIB. The total contract price was $8,000.00. On or about April 14, 2014,

P.S. wrote a $500.00 check to Residential Services of America. On or about May 27, 2014, P.S. obtained three cashier's checks totaling $14,980.00 payable to A.M.P. The checks were deposited into A.M.P.'s bank account. On or about May 28, 2014, $6,980.00 in cash was withdrawn from A.M.P.'s bank account. The same day, $6,980.00 was deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR.

### Property on Spar Street in Chesapeake, Virginia

13.     On or about May 13, 2014, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowner, S.R., to HLIB. The document stated that A.M.P. would perform the following work to the home: install new 30 year architectural shingles, repair subfloor, make floor level, sister in new floor joint beam in master bedroom area. The total contract price was $20,080.00. On or about May 29, 2014, HLIB wired $20,080.84 into S.R.'s bank account, which represented proceeds of the loan. On or about June 1, 2014, S.R. wrote a $2,500.00 check to Residential Services of America. On or about June 2, 2014, S.R. wrote two checks totaling $15,580.00 to A.M.P. The checks were deposited into A.M.P.'s bank account. On or about June 2, 2014, $7,580.00 in cash was withdrawn from A.M.P.'s bank account. The same day, $7,580.00 was deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR.

### Property on Sean Drive in Chesapeake, Virginia

14.     On or about June 20, 2014, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowners, C.T. and C.T., to Admirals. The document stated that A.M.P. would perform the following work to the home: install new ceramic tile floor in the kitchen; install a new privacy

fence; and in the main bathroom, install a new tub/shower unit with new fixtures, a new toilet, a new sink with lower cabinet, new tile floor, wall mirror, track lighting, and paint. The total contract price was $23,338.00. On or about July 21, 2014, Admirals wired $23,338.21 into C.T.'s and C.T.'s bank account, which represented proceeds of the loan. On or about June 20, 2014, C.T. wrote a $500.00 check to Residential Services of America. On or about July 20, 2014, C.T. wrote a $2,000.00 check to Residential Services of America. On or about July 20, 2014, C.T. wrote a $19,980.00 check to A.M.P. The check was deposited into A.M.P.'s bank account. On or about July 22, 2014, $10,480.00 in cash was withdrawn from A.M.P.'s bank account. The same day, $10,480.00 was deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR.

### Property on Martin Avenue in Chesapeake, Virginia

15.    On or about July 17, 2014, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowner, T.F., to Admirals. The document stated that A.M.P. would perform the following work to the home: repair the existing wooden deck, repair a 4 x 4 foot area of subfloor in the hall bathroom, and install a custom jetted tub with ceramic tile surround, steps, and floor in the second downstairs bath. The total contract price was $23,341.00. On or about July 29, 2014, Admirals wired $23,341.49 into T.F.'s bank account, which represented proceeds of the loan. On or about July 5, 2014, T.F. wrote a $500.00 check to Residential Services of America. On or about July 29, 2014, T.F. obtained two cashier's checks totaling $8,000.00 payable to Residential Services of America. All three checks were deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR.

7

### Property on Joshua Drive in Virginia Beach, Virginia

16.    On or about August 9, 2014, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowners, D.B. and G.B., to Admirals. The document stated that A.M.P. would perform the following work to the home: install a new laminate wood floor; install new carpet; install a new standard combination tub/shower insert unit; install new toilet; install a new shower insert, twin sink, and lower cabinet in the master bathroom; and install a stainless steel twin kitchen sink. The total contract price was $23,340.00. On or about September 11, 2014, Admirals wired $23,338.21 into D.B.'s and G.B.'s bank account, which represented proceeds of the loan. On or about August 9, 2014, D.B. wrote a $500.00 check to Residential Services of America. On or about September 11, 2014, D.B. obtained a cashier's check in the amount of $2,000.00 payable to Residential Services. The two checks were deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR. On or about September 11, 2014, D.B. obtained a cashier's check in the amount of $15,980.00 payable to AMP Construction. The check was deposited into A.M.P.'s bank account. On or about September 15, 2014, $7,480.00 in cash was withdrawn from A.M.P.'s bank account. The same day, $7,480.00 was deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR.

### Property on Forsythe Court in Chesapeake, Virginia

17.    On or about October 10, 2014, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowners, W.E. and A.E., to Admirals. The document stated that A.M.P. would perform the following work to the home: install new wood fascia boards where needed, re-install rain gutters, install new gutter leaf guards, remove existing driveway and install a new wide concrete

8

driveway, and install two new garage doors. The total contract price was $22,000.00. Another contract between A.M.P. and the homeowners was located. This contract was also dated October 10, 2014. The description of work on the second contract was the same as the first, however, the total contract price of the second contract was $13,980.00. On or about November 12, 2014, Admirals wired $22,000.65 into W.E.'s and A.E.'s bank account, which represented proceeds of the loan. On or about October 10, 2014, A.E. wrote a check in the amount of $250.00 to Residential Services of America. On or about November 12, 2014, A.E. wrote a check in the amount of $2,250.00 payable to Residential Services of America. On or about November 12, 2014, A.E. wrote a check in the amount of $13,980.00 payable to Residential Services of America. The checks were deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR.

### Property on White Heron Run in Chesapeake, Virginia

18.     On or about January 19, 2015, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowner, J.R., to Admirals. The document stated that A.M.P. would perform the following work to the home: install a new concrete driveway and front walkway. The total contract price was $23,331.00. On or about February 26, 2015, Admirals wired $23,348.22 into J.R.'s bank account, which represented proceeds of the loan. Another contract between A.M.P. and J.R. was located. This contract was also dated January 19, 2015. The description of work on the second contract was the same as the first, except it also stated that new ceramic outdoor tiles would be installed around the edge of the pool. The total contract price of the second contract was $19,980.00. On or about January 18, 2015, J.R. wrote a check in the amount of $1,000.00 to Residential Services of America. On or about February 26, 2015, J.R. wrote a check in the amount

of $10,000.00 payable to Residential Services of America. On or about April 20, 2015, J.R. wrote

a check in the amount of $7,500.00 payable to Residential Services of America. The checks were

deposited into an account in the name of Equibates International d/b/a Residential Services of

America, which was solely controlled by ZIGLAR. Three checks totaling $3,300 were drawn on

the same account and made were made payable to Contractor #1. Two checks totaling $4,500

drawn on the same account were made payable to Contractor #2.

### Property on Midway Avenue in Chesapeake, Virginia

19.     On or about January 10, 2015, ZIGLAR submitted a fictitious contract between

A.M.P. and the homeowners, M.W. and M.W., to Admirals. The document stated that A.M.P.

would perform the following work to the home:

- Bathroom area: install new twin sink with lower cabinet, install new tile flooring, install new high seat toilet, install new combination tub/shower unit and fixtures with sliding glass door, new wall mirror, track light fixture, exhaust fan, new medicine cabinet, and paint walls and ceiling.
- Install glass shower door in second bathroom.
- Install three interior wood sliding doors.
- Install three interior wood doors.

The total contract price was $23,338.00. On or about February 26, 2015, Admirals wired

$23,344.83 into the borrowers' bank account, which represented proceeds of the loan. M.W.

provided a copy of a "Service Agreement" dated January 10, 2015, between Residential Services

of America and M.W. and his wife. In exchange for $1,500, Residential Services of America was

supposed to refer M.W. and M.W. to a licensed broker or lender for the funding of home

improvements and provide a qualified licensed contractor to perform the remodeling and home

improvement work. M.W. also provided a "Contractor Acceptance Agreement" dated November

4, 2015, between Jackson and Residential Services of America for work to the home on Midway

Avenue. According to the agreement, Jackson was to perform the work stated in the A.M.P. contract submitted to Admirals, except Jackson was to install two interior doors, instead of three. The total contract price was $6,000.00. On or about January 10, 2015, M.W. wrote a check in the amount of $500.00 to Residential Services of America. The memo line showed: Service Agreement. On or about February 27, 2015, M.W. wrote a check in the amount of $1,000.00 payable to Residential Services. The memo line showed: Home Repair. On or about February 27, 2015, M.W. wrote a check in the amount of $12,580.00 payable to Residential Services of Am. The memo line showed: Home Repair. The checks were deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR. Two checks totaling $4,500 were drawn on the same account and made were made payable to Jackson. The memo line on the first check showed: 1st Wilson Draw and on the second check showed: 2nd draw for Wilson.

### *Property on Cobblewood Bend in Chesapeake, Virginia*

20.    On or about January 10, 2015, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowners, J.M. and A.M., to Admirals. The document stated that A.M.P. would perform the following work to the home: install three season glass enclosed patio room addition, approximately 10' x 11', and install two new roof vents. The total contract price was $15,000.00. On or about March 10, 2015, Admirals funded the loan. The funding amount, after applicable fees, was $15,008.39. J.M. provided a copy of a "Service Agreement" dated February 10, 2015, between Residential Services of America and J.M. and A.M. In exchange for $2,500, Residential Services of America was supposed to refer J.M. and A.M. to a licensed broker or lender for the

11

funding of home improvements and provide a qualified licensed contractor to perform the remodeling and home improvement work.

21.    On or about April 29, 2014, J.M. wrote a check in the amount of $350.00 to Residential Services of America. The memo line showed: Service Fee Home Repairs. On or about April 29, 2014, J.M. wrote a check in the amount of $150.00 payable to Residential Services of America. The memo line showed: Service Fee Home Repair. On or about March 10, 2015, J.M. wrote a check in the amount of $2,000.00 payable to Residential Services. The memo line showed: Services Agreement. On or about March 10, 2015, J.M. wrote a check in the amount of $7,480.00 payable to Residential Services. The memo line showed: Services Agreement. The $350.00, $2,000.00, and $7,480.00 checks were deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR. Two checks totaling $1,250 were drawn on the same account and were made payable to Contractor #2. The memo lines on both checks referenced the Cobblewood Bend address. The work to this property was never completed.

### *Property on Sangaree Circle in Virginia Beach, Virginia*

22.    On or about May 5, 2015, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowner, M.C., to HLIB. The document stated that A.M.P. would perform the following work to the home: paint all interior walls and baseboard trim and install two new toilets. The total contract price was $6,900.00. On or about June 30, 2015, Admirals wired $6,907.00 into M.C.'s bank account, which represented proceeds of the loan. On or about June 30, 2015, M.C. wrote a check in the amount of $5,980.00 to Residential Services of America. The memo line showed: Home Improvement. On or about June 30, 2015, M.C. wrote a check in the amount of

$1,000.00 payable to Residential Services of America. The checks were deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR. A check in the amount of $1,000.00 was drawn on the same account and made were made payable to AMP. The memo lines on the check referenced M.C.

### Property on West Norfolk Road in Portsmouth, Virginia

23.    On or about May 14, 2015, ZIGLAR submitted a fictitious contract between KTB and the homeowner, W.W., to HLIB. The document stated that KTB would perform the following work to the home: install new plywood, new felt bonding paper, new 30-year architectural shingles, install new flashing where needed, a new attic fan, two roof turbines and seamless aluminum rain gutters and downspouts. The total contract price was $23,335.00 [other parts of the contract showed the total contract price as $23,350.00]. On or about June 30, 2015, HLIB wired $23,354.67 into W.W.'s bank account, which represented proceeds of the loan. On or about May 14, 2015, W.W. wrote a check in the amount of $1,000.00 to Residential Services of America. On or about June 30, 2015, W.W. wrote a check in the amount of $1,500.00 payable to Residential Services of America. The memo line showed: Service Agreement. On or about June 30, 2015, W.W. wrote a check in the amount of $14,980.00 payable to Residential Services of America. The memo line showed: Home Improvement Roof. The checks were deposited into an account in the name of Equibates International d/b/a Residential Services of America, which was solely controlled by ZIGLAR. KTB never performed any work on W.W.'s home. W.W. told the lender that he used approximately $5,000.00 of the loan proceeds to pay off personal bills, which is prohibited by the Title I Property Improvement Loan Program.

### *Property on Portlock Road in Chesapeake, Virginia*

24.     On or about October 3, 2015, ZIGLAR submitted a fictitious contract between KTB and the homeowners, A.L. and E.L., to Admirals.  The document stated that KTB would perform the following work to the home: install 15 new custom made premium insulated vinyl replacement windows, remove existing shingles, and install new 30-year architectural roof shingles.  The total contract price was $31,380.00.  On or about October 30, 2015, Admirals wired $23,340.75 into A.L.'s and E.L.'s bank account, which represented proceeds of the loan.  A.L. and E.L. received a supplemental loan from Admirals.  The net proceeds of that loan were $8,050.31.  Those loan proceeds were also wired into their bank account on or about October 30, 2015.  On or about October 3, 2015, E.L. wrote a check in the amount of $100.00 payable to Professional Home Advisor.  The memo line showed: down payment.  On or about October 30, 2015, E.L. wrote a check in the amount of $2,400.00 payable to Professional Home Advisor.  The memo line showed: balance for service agreement.  On or about October 30, 2015, E.L. wrote a check in the amount of $19,980.00 payable to Professional Home Advisor.   The memo line showed: home improvements.  The checks were deposited into an account in the name of Equibates International t/a Professional Home Advisor, which was solely controlled by ZIGLAR.  KTB never performed any work on A.L. and E.L.'s home.  A check dated November 1, 2015, was made payable to A.M.P. in the amount of $8,850.00.  The memo line referenced A.L. and E.L. and showed their address.

### *Property on Cooper Drive in Portsmouth, Virginia*

25.     On or about December 4, 2015, ZIGLAR submitted a fictitious contract between KTB and the homeowner, R.R., to Admirals.  The document stated that KTB would perform the

following work to the home: install two new insulated storm doors, convert the existing HVAC [Heating, Ventilation, and Air Conditioning] system to an all-electric system, upgrade the home's electrical system, and install a 220 volt outlet for the stove. The total contract price was $23,400.00. On or about January 19, 2016, Admirals wired $23,344.25 into R.R.'s bank account, which represented proceeds of the loan. On or about December 4, 2015, R.R. wrote a check in the amount of $500.00 payable to Professional Home Advisor. The memo line showed: loan. On or about January 19, 2016, R.R. wrote a check in the amount of $2,000.00 payable to Professional Home Advisor. On or about January 19, 2016, R.R. obtained an official bank check in the amount of $14,980.00 payable to Professional Home Advisors. The checks were deposited into an account in the name of Equibates International t/a Professional Home Advisor, which was solely controlled by ZIGLAR. KTB never performed any work on R.R.'s home. A check dated January 22, 2016, drawn on the same account was made payable to Contractor #3 in the amount of $5,800.00. The memo line showed: R.R.'s name. R.R. used the leftover loan proceeds to consolidate bills, which is prohibited by the Title I Property Improvement Loan Program. R.R. said James knew she was using part of the loan proceeds to consolidate bills.

### Property on Piedmont Avenue in Portsmouth, Virginia

26.     On or about January 5, 2016, ZIGLAR submitted a fictitious contract between KTB and the homeowner, M.W., to Admirals. The document stated that KTB would perform the following work to the home: remove existing roof shingles, install new 30-year architectural roof shingles, upgrade the electrical panel box, sister the main support beam, level floor, and install a new countertop and kitchen sink. The total contract price was $23,400.00. On or about January 29, 2016, Admirals wired $23,344.25 into M.W.'s bank account, which represented proceeds of the

15

loan.  On or about January 6, 2016, M.W. wrote a check in the amount of $500.00 payable to Professional Home Advisor.  The memo line showed: Home Remodeling.  On or about January 29, 2016, M.W. wrote a check in the amount of $2,000.00 payable to Professional Home Advisor. The memo line showed: Service Agreement.  On or about January 29, 2016, M.W. wrote a check in the amount of $19,980.00 payable to Professional Home Advisors.  The memo line showed: Home imp.  The first two checks were deposited into an account in the name of Equibates International t/a Professional Home Advisor, which was solely controlled by ZIGLAR.  The check for $19,980.00 was deposited into a different account in the name of Equitables International, Inc. d/b/a Professional Home Advisors.  A check dated February 3, 2016, drawn on the Equitables International, Inc. d/b/a Professional Home Advisors account was made payable to A.M.P. in the amount of $9,600.00.  The memo line showed: M.W.'s name and address.  KTB never performed any work on R.R.'s home.

### Property on Baskerville Lane in Portsmouth, Virginia

27.     On or about March 24, 2016, ZIGLAR submitted a fictitious contract between KTB and the homeowners, R.B. and J.B., to Admirals.  The document stated that KTB would perform the following work to the home: install a new 2.5 ton combination HVAC (gas pack) system, remove existing concrete driveway and front walkway, install new concrete driveway and front walkway, and install a new storm door.  The total contract price was $23,300.00.  On or about April 11, 2016, Admirals wired $23,394.22 into R.B.'s and J.B's bank account, which represented proceeds of the loan.  A "Contractor Acceptance Agreement" dated April 18, 2016, between Contractor #3 and Equibates International, Inc. d/b/a Professional Home Advisor for work to the home on Baskerville Lane was executed.  According to the agreement, Contractor #3 was supposed to install a new two

and a half ton combination HVAC (gas pack) system and replace or repair the ductwork. The total contract price was $5,000.00. The agreement stated that the contractor would not make any change or change order to the specification or engage in any price quote conversation with R.B. and J.B. On or about April 11, 2016, J.B. wrote a check in the amount of $2,400.00 payable to Professional Home Advisor. The memo line showed: air condition. On or about April 11, 2016, J.B. wrote a check in the amount of $15,980.00 payable to Professional Home Advisor. The memo line showed: Home Improvement. The checks were deposited into an account in the name of Equibates International t/a Professional Home Advisor, which was solely controlled by ZIGLAR. A check dated February 3, 2016, drawn on the same Equitables International, Inc. d/b/a Professional Home Advisors account was made payable to Contractor #3 in the amount of $5,000.00. The memo line showed R.B.'s name and HVAC. A check dated April 25, 2016, drawn on the same account was made payable to Contractor #1 in the amount of $1,825.00. The memo line showed R.B.'s name and the word driveway. KTB never performed any work on R.B.'s and J.B.'s home.

### *Property on Sir Lancelot Court in Chesapeake, Virginia*

28.     On or about February 6, 2016, ZIGLAR submitted a fictitious contract between KTB and the homeowner, C.W., to Admirals. The document stated that KTB would perform the following work to the home: install new premium exterior vinyl siding, install premium vinyl soffit, install PVC rack board trim, install a new tub/shower unit, install new faucets, install a new toilet, refinish and paint bathroom walls, and install a mirror in place of the medicine cabinet. The total contract price was $23,344.00. On or about April 14, 2016, Admirals wired $23,344.25 into C.W.'s bank account, which represented proceeds of the loan. On or about February 6, 2016, C.W. wrote a check in the amount of $500.00 payable to Professional Home Advisor. On or about April

14, 2016, C.W. wrote a check in the amount of $2,000.00 payable to Professional Home Advisor. On or about April 14, 2016, C.W. wrote a check in the amount of $19,980.00 payable to Professional Home Advisor. The checks were deposited into an account in the name of Equitables International, Inc. d/b/a Professional Home Advisors. A check dated February 3, 2016, drawn on the Equitables International, Inc. d/b/a Professional Home Advisors account was made payable to A.M.P. in the amount of $8,500.00. The memo line referenced C.W.'s job. KTB never performed any work on C.W.'s home.

### *Property on Prospect Lane in Virginia Beach, Virginia*

29.      On or about April 6, 2016, ZIGLAR submitted a fictitious contract between KTB and the homeowners, D.N. and T.N., to Admirals. The document stated that KTB would perform the following work to the home: install eight new custom-made premium vinyl double-hung, tilt-in sash, lifetime replacement windows. The total contract price was $23,300.00. On or about April 29, 2016, Admirals wired $23,293.22 into D.N.'s and T.N.'s bank account, which represented proceeds of the loan. On or about April 29, 2016, D.N. wrote a check in the amount of $2,000.00 payable to Professional Home Advisor. The memo line showed: Service Agreement. On or about April 29, 2016, D.N. wrote a check in the mount of $5,560.00 payable to Professional Home Advisor. The memo line showed: Home Improvements. The checks were deposited into an account in the name of Equitables International, Inc. d/b/a Professional Home Advisors. A check dated May 3, 2016, drawn on the Equitables International, Inc. d/b/a Professional Home Advisors account was made payable to A.M.P. in the amount of $2,400.00. The memo line referenced D.N.'s and T.N.'s job. D.N. and T.N. used the leftover loan proceeds to consolidate bills, which is prohibited by the Title I Property Improvement Loan Program. T.N. said James told him he

could use the leftover money for whatever he wanted. KTB never performed any work on D.N.'s and T.N.'s home.

### Property on Gosling Court in Virginia Beach, Virginia

30.    On or about August 20, 2016, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowners, M.S. and J.S., to Admirals. The document stated that A.M.P. would perform the following work to the home: install a new custom designed concrete driveway with decorative borders. The total contract price was $23,300.00. On or about September 21, 2016, Admirals wired $23,293.22 into M.S.'s and J.S.'s bank account, which represented proceeds of the loan. M.S. provided a copy of a "Service Agreement" dated August 20, 2016, between Professional Home Advisor and M.S. and his wife. In exchange for $2,500, Professional Home Advisor was supposed to refer M.S. and J.S. to a licensed broker or lender for the funding of home improvements and provide a qualified licensed contractor to perform the remodeling and home improvement work. On or about August 20, 2016, M.S. wrote a check in the amount of $500.00 payable to Professional Home Advisor. The memo line showed: Service Agreement. On or about September 26, 2016, M.S. wrote a check in the amount of $2,000.00 payable to Professional Home Advisor. On or about September 26, 2016, M.S. wrote a check in the amount of $4,975.00 payable to Professional Home Advisor. The memo line showed: New Driveway. The checks were deposited into an account in the name of Equitables International, Inc. d/b/a Professional Home Advisors. No work was performed on M.S's and J.S.'s home by A.M.P. or any other contractor.

### Property on N. Lakeland Drive in Norfolk, Virginia

31.    On or about August 19, 2016, ZIGLAR submitted a fictitious contract between KTB and the homeowner, P.G., to Admirals. The document stated that KTB would perform the

following work to the home: remove the existing bathtub/shower unit, install a new combination one-piece tub/shower unit with fixtures, install new sub-floor, install new tile flooring, and install one new bay window. The total contract price was $23,260.00. On or about September 30, 2016, Admirals wired $23,264.32 into P.G.'s bank account, which represented proceeds of the loan. On or about August 19, 2016, P.G. wrote a check in the amount of $500.00 payable to Professional Home Advisor. On or about September 30, 2016, P.G. wrote a check in the amount of $2,000.00 payable to Professional Home Advisor. On or about September 30, 2016, P.G. wrote a check in the amount of $19,980.00 payable to Professional Home Advisor. The checks were deposited into an account in the name of Equitables International, Inc. d/b/a Professional Home Advisors. A check dated October 1, 2016, drawn on the same account was made payable to A.M.P. in the amount of $4,500.00. The memo line of the check referenced P.G. KTB never performed any work on P.G.'s home.

### Property on Shoal Court in Portsmouth, Virginia

32.     On or about October 10, 2016, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowners, C.C. and P.C., to Admirals. The document stated that A.M.P. would perform the following work to the home: install 18 custom-made premium insulated double-hung vinyl lifetime replacement windows, install new wall-to-wall carpeting in the living room, dining room, stairs, hallway, and four bedrooms, and install a new standard rear entry door and repair the frame. The total contract price was $23,300.00. On or about October 28, 2016, Admirals wired $23,259.22 into C.C.'s bank account, which represented proceeds of the loan. C.C. and P.C. provided a copy of a "Service Agreement" dated October 10, 2016, between Professional Home Advisor and C.C. and P.C. In exchange for $2,500, Professional Home Advisor was supposed to

refer C.C. and P.C. to a licensed broker or lender for the funding of home improvements and provide a qualified licensed contractor to perform the remodeling and home improvement work. On or about October 10, 2016, P.C. wrote a check in the amount of $500.00 payable to Professional Home Advisor. On or about October 28, 2016, C.C. wrote a check in the amount of $2,000.00 payable to Professional Home Advisor. The memo line showed: Fee Agreement. On or about October 28, 2016, C.C. wrote a check in the amount of $17,980.00 payable to Professional Home Advisor. The checks were deposited into an account in the name of Equitables International, Inc. d/b/a Professional Home Advisors. A check dated November 3, 2016, drawn on the same account was made payable to A.M.P. in the amount of $9,900.00. The memo line of the check referenced C.C.'s and P.C.'s job.

### Property on Poinsetta Arch in Virginia Beach, Virginia

33.     On or about October 15, 2016, ZIGLAR submitted a fictitious contract between A.M.P. and the homeowners, E.W. and J.W., to Admirals. The document stated that A.M.P. would perform the following work to the home: remove the existing roof shingles and felt paper, install new felt paper and flashing where needed, install new architectural 30-year roof shingles, install new seamless rain gutters with leaf guard, paint shutters, install PVC trim coil, and install approximately 66 feet of vinyl privacy fence with a gate. The total contract price was $23,300.00. On or about November 30, 2016, Admirals wired $23,264.32 into E.W.'s and J.W.'s bank account, which represented proceeds of the loan. On or about October 15, 2016, J.W. wrote a check in the amount of $500.00 payable to Professional Home Advisor. On or about November 30, 2016, J.W. wrote a check in the amount of $2,000.00 payable to Professional Home Advisor. On or about November 30, 2016, J.W. wrote a check in the amount of $16,000.00 payable to Professional Home Advisor.

21

The checks were deposited into an account in the name of Equitables International, Inc. d/b/a Professional Home Advisors. A check dated November 30, 2016, drawn on the same account was made payable to A.M.P. in the amount of $10,000.00. The memo line of the check referenced E.W.

### Property on 27th Street in Newport News, Virginia

34.    On or about March 24, 2017, ZIGLAR submitted a fictitious contract between Jackson and the homeowner, S.P., to Admirals. The document stated that A.M.P. would perform the following work to the home: install new premium vinyl siding, install new premium vinyl soffit material, install PVC trim coil stock, install new upper and lower stock kitchen cabinets, and install new formica-style countertops. The total contract price was $23,350.00. On or about May 23, 2017, Admirals wired $23,265.32 into S.P.'s bank account, which represented proceeds of the loan. S.P. provided a copy of a "Service Agreement" dated March 24, 2017, between Dream Homes of Virginia and S.P. In exchange for $2,500, Dream Homes of Virginia was supposed to refer S.P. to a licensed broker or lender for the funding of home improvements and provide a qualified licensed contractor to perform the remodeling and home improvement work. S.P. also provided a "Contractor Acceptance Agreement" dated August 2, 2017, between Jackson and Dream Homes of Virginia for work to the home on 27th Street. According to the agreement, Jackson was supposed to install new premium vinyl siding, install new premium vinyl soffit and PVC trim coil stock, and repair wood as needed. The total contract price was $6,000.00. The agreement stated that the contractor would not make any change or change order to the specification or engage in any price quote dialogue with S.P. On or about April 1, 2017, S.P. wrote a check in the amount of $500.00 payable to Dream Homes of VA. On or about May 23, 2017,

S.P. wrote a check in the amount of $2,000.00 payable to Dream Homes of VA. The memo line showed: Service Agreement. On or about May 23, 2017, S.P. wrote a check in the amount of $19,480.00 payable to Dream Homes of VA. The checks were deposited into an account in the name of ZIGLAR d/b/a Dream Homes of Virginia. A check dated July 10, 2017, drawn on the same account was made payable to Contractor #4 in the amount of $760.00. The memo line of the check referenced S.P.'s address. An undated check which was negotiated on August 2, 2017, drawn on the same account was made payable to Jackson in the amount of $3,000.00. The memo line showed S.P. siding job. The siding work on S.P.'s house was never started.

### *Property on Vista Point Drive in Hampton, Virginia*

35.     On or about August 25, 2017, ZIGLAR submitted a fictitious contract between Key and the homeowners, L.B. and I.B., to HLIB. The document stated that Key would perform the following work to the home: remove existing roof shingles and old felt paper, check whole surface for any bad wood, install new felt bonding material over whole service, install new flashing where needed, and install new 30-year guaranteed architectural roof shingles over whole roof surface. The total contract price was $23,325.00. The contract showed that Key's address was P.O. Box 65581, Virginia Beach, Virginia 23467. Post Office Box 65581 was rented by Dream Homes of Virginia and ZIGLAR was the person who applied for the Post Office Box.

36.     On or about September 28, 2017, HLIB wired $23,353.67 into L.B.'s and I.B.'s bank account, which represented proceeds of the loan. L.B. and I.B. provided a copy of a "Service Agreement" dated August 12, 2017, between Dream Homes of Virginia and L.B. and I.B. In exchange for $2,500, Dream Homes of Virginia was supposed to refer L.B. and I.B. to a licensed broker or lender for the funding of home improvements and provide a qualified licensed contractor

to perform the remodeling and home improvement work.  On or about August 12, 2017, I.B. wrote a check in the amount of $1,250.00 payable to Dream Homes of Virginia.  The memo line showed: Service Agreement.  On or about September 29, 2017, I.B. wrote a check in the amount of $1,250.00 payable to Dream Homes of Virginia.  The memo line showed: Home Repairs.  On or about September 29, 2017, I.B. wrote a check in the amount of $13,980.00 payable to Dream Homes of Virginia.  The checks were deposited into an account in the name of ZIGLAR d/b/a Dream Homes of Virginia.

37.     L.B. and I.B. made a complaint to the Better Business Bureau because the work on their home was not completed.  ZIGLAR, using the alias Julian Brian James, responded to the Better Business Bureau complaint.  He stated in the response that under the FHA loan program used by L.B. and I.B. all funds must be used for home improvements only.  ZIGLAR further stated that L.B. "...planned to use the extra money he got in the loan, to pay-off his wife's credit cards, which is forbidden by FHA."

### Property on Palem Road in Norfolk, Virginia

38.     On or about May 9, 2018, ZIGLAR submitted a fictitious contract between KTB and the homeowners, A.W. and S.W., to Admirals.  The document stated that KTB would perform the following work to the home: replace his roof and two bathroom floors.  The total contract price was $23,380.00.  On or about June 6, 2018, Admirals wired $23,253.22 into A.W.'s and S.W.'s bank account, which represented proceeds of the loan.  A.W. provided a copy of a "Service Agreement" dated March 2, 2018, between Dream Homes of Virginia and A.W. and S.W.  In exchange for $2,500, Dream Homes of Virginia was supposed to refer A.W. and S.W. to a licensed broker or lender for the funding of home improvements and provide a qualified licensed contractor

24

to perform the remodeling and home improvement work. A.W. said he paid James $100 in cash at the time the "Service Agreement" was signed and later gave him an additional $300 in cash. On or about June 6, 2018, A.W. wrote a check in the amount of $22,980.00 payable to Dream Homes of VA. The check was deposited into an account in the name of ZIGLAR d/b/a Dream Homes of Virginia.

## COUNTS ONE THROUGH TWENTY-FOUR
(False Statements to a Financial Institution)

THE GRAND JURY CHARGES THAT:

1.    The allegations contained in the General Allegations section of the Indictment are reavailed and incorporated as if set forth fully herein.

2.    On or about the dates and in connection with the loan applications set forth below, in the Eastern District of Virginia and elsewhere, GREGORY J. ZIGLAR, the defendant herein, knowingly made false statements and reports for the purpose of influencing the action of Admirals Bank ("Admirals) and Home Loan Investment Bank ("HLIB"), both financial institutions that were insured by the Federal Deposit Insurance Corporation, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, as follows:

| Count | Date (on or about) | False Statement |
|-------|--------------------|-----------------|
| 1 | 5/07/2014 | An inflated and fictitious contract for proposed renovations to the Hoover Avenue property sent to HLIB. |
| 2 | 5/13/2014 | An inflated and fictitious contract for proposed renovations to the Spar Street property sent to HLIB. |
| 3 | 6/20/2014 | An inflated and fictitious contract for proposed renovations to the Sean Drive property sent to Admirals. |
| 4 | 7/17/2014 | An inflated and fictitious contract for proposed renovations to the Martin Avenue property sent to Admirals. |
| 5 | 8/09/2014 | An inflated and fictitious contract for proposed renovations to the Joshua Drive property sent to Admirals. |
| 6 | 10/10/2014 | An inflated and fictitious contract for proposed renovations to the Forsythe Court property sent to Admirals. |
| 7 | 1/19/2015 | An inflated and fictitious contract for proposed renovations to the White Heron Run property sent to Admirals. |
| 8 | 1/10/2015 | An inflated and fictitious contract for proposed renovations to the Midway Avenue property sent to Admirals. |
| 9 | 1/10/2015 | An inflated and fictitious contract for proposed renovations to the Cobblewood Bend property sent to Admirals. |
| 10 | 5/05/2015 | An inflated and fictitious contract for proposed renovations to the Sangaree Circle property sent to HLIB. |

26

| 11 | 5/14/2015 | An inflated and fictitious contract for proposed renovations to the West Norfolk Road property sent to HLIB. |
| 12 | 10/03/2015 | An inflated and fictitious contract for proposed renovations to the Portlock Road property sent to Admirals. |
| 13 | 12/04/2015 | An inflated and fictitious contract for proposed renovations to the Cooper Drive property sent to Admirals. |
| 14 | 1/05/2016 | An inflated and fictitious contract for proposed renovations to the Piedmont Avenue property sent to Admirals. |
| 15 | 3/24/2016 | An inflated and fictitious contract for proposed renovations to the Baskerville Lane property sent to Admirals. |
| 16 | 2/06/2016 | An inflated and fictitious contract for proposed renovations to the Sir Lancelot Court property sent to Admirals. |
| 17 | 4/06/2016 | An inflated and fictitious contract for proposed renovations to the Prospect Lane property sent to Admirals. |
| 18 | 8/20/2016 | An inflated and fictitious contract for proposed renovations to the Gosling Court property sent to Admirals. |
| 19 | 8/19/2016 | An inflated and fictitious contract for proposed renovations to the N. Lakeland Drive property sent to Admirals. |
| 20 | 10/10/2016 | An inflated and fictitious contract for proposed renovations to the Shoal Court property sent to Admirals. |
| 21 | 10/15/2016 | An inflated and fictitious contract for proposed renovations to the Poinsetta Arch property sent to Admirals. |
| 22 | 3/24/2017 | An inflated and fictitious contract for proposed renovations to the 27th Street property sent to Admirals. |
| 23 | 8/25/2017 | An inflated and fictitious contract for proposed renovations to the Vista Point Drive property sent to HLIB. |
| 24 | 5/09/2018 | An inflated and fictitious contract for proposed renovations to the Palem Road property sent to Admirals. |

(In violation of Title 18, United States Code, Section 1014.)

## COUNT TWENTY-FIVE
(Aggravated Identity Theft)

THE GRAND JURY FURTHER CHARGES THAT:

1.    The allegations contained in the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.    On or about August 20, 2016, in the Eastern District of Virginia and elsewhere, the defendant, GREGORY J. ZIGLAR, did knowingly use, without lawful authority, a means of identification of another person, consisting of Virginia Contractor's License No. XXXXXX6755 assigned to M.P., during and in relation to a felony violation of a provision contained in Chapter 47 of Title 18, to wit, False Statements to a Financial Institution, in violation of Title 18, United States Code, § 1014, knowing that the means of identification belonged to MP, another actual person.

(In violation of Title 18, United States Code Section 1028A(a)(1) and (c).)

28

## COUNT TWENTY-SIX
(Aggravated Identity Theft)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The allegations contained in the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.      On or about March 24, 2017, in the Eastern District of Virginia and elsewhere, the defendant, GREGORY J. ZIGLAR, did knowingly use, without lawful authority, a means of identification of another person, consisting of Virginia Contractor's License No. XXXXXX1783 assigned to L.J., during and in relation to a felony violation of a provision contained in Chapter 47 of Title 18, to wit, False Statements to a Financial Institution, in violation of Title 18, United States Code, § 1014, knowing that the means of identification belonged to LJ, another actual person.


(In violation of Title 18, United States Code, Section 1028A(a)(1) and (c).)

29

## COUNTS TWENTY-SEVEN THROUGH THIRTY-SIX
### (Promotional Money Laundering)

THE GRAND JURY FURTHER CHARGES THAT:

1.    The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.    On or about the dates and in the manner set forth below, in the Eastern District of Virginia, GREGORY J. ZIGLAR, the defendant herein, did knowingly conduct, attempt to conduct and cause to be conducted, financial transactions affecting interstate and foreign commerce, as described below, which involved the proceeds of specified unlawful activity, that is, False Statements to Financial Institution, in violation Title 18, United States Code, Section 1014, with the intent to promote the carrying on of the said specified unlawful activity, and that while conducting, attempting to conduct and causing such financial transactions to be conducted, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity:

| Count | Date (on or about) | Financial Transaction |
|-------|--------------------|------------------------|
| 27 | 9/26/2014 | ZIGLAR made payment of $1,069.54 to Professional Printing Center, using a debit card associated with an Equibates International dba Residential Services of America bank account, for payment for printing advertisement flyers. |
| 28 | 3/20/2015 | ZIGLAR made payment of $1,256.10 to Professional Printing Center, using a debit card associated with an Equibates International dba Residential Services of America bank account, for payment for printing advertisement flyers. |

30

| 29 | 7/09/2015 | ZIGLAR made payment of $1,309.10 to Professional Printing Center, using a debit card associated with an Equibates International dba Residential Services of America bank account, for payment for printing advertisement flyers. |
| 30 | 8/04/2015 | ZIGLAR made payment of $1,309.10 to Professional Printing Center, using a debit card associated with a Gregory J Ziglar bank account, for payment for printing advertisement flyers. |
| 31 | 11/2/2015 | ZIGLAR made payment of $1,314.40 to Professional Printing Center, using a debit card associated with an Equibates International dba Residential Services of America bank account, for payment for printing advertisement flyers. |
| 32 | 2/16/2016 | ZIGLAR made payment of $1,256.10 to Professional Printing Center, using a debit card associated with an Equitables International, Inc. dba Professional Home Advisors bank account, for payment for printing advertisement flyers. |
| 33 | 2/26/2016 | ZIGLAR made payment of $1,256.10 to Professional Printing Center, using a debit card associated with an Equitables International, Inc. dba Professional Home Advisors bank account, for payment for printing advertisement flyers. |
| 34 | 10/11/2016 | ZIGLAR made payment of $2,622.44 to Professional Printing Center, using check number 1103 associated with an Equitables International, Inc. dba Professional Home Advisors bank account, for payment for printing advertisement flyers. |
| 35 | 6/26/2017 | ZIGLAR made payment of $1,947.22 to Professional Printing Center, using a debit card associated with a Gregory J Ziglar dba Dream Homes of Virginia bank account, for payment for printing advertisement flyers. |
| 36 | 10/10/2017 | ZIGLAR made payment of $673.63 to Professional Printing Center, using a debit card associated with a Gregory J Ziglar dba Dream Homes of Virginia bank account, for payment for printing advertisement flyers. |

(In violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).)

31

## FORFEITURE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

1.     Defendant GREGORY J. ZIGLAR, if convicted of one or more of the violations alleged in counts one through twenty-four of the indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the violation.

2.     Defendant GREGORY J. ZIGLAR, if convicted of the violation alleged in count INSERT MONEY LAUNDERING HERE of the indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved in the offense, or any property traceable to such property.

3.     If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

3.     The property subject to forfeiture under paragraph 1 includes, but is not limited to, the following property:

32

A sum of money of at least $521,904.49 which represents the proceeds of the offenses charged in counts one through twenty-four that the defendant obtained and that, upon entry of an order of forfeiture, shall be reduced to a monetary judgment.

(All in accordance with Title 18, United States Code, Sections 982(a)(1) and (a)(2)(A); and Title 21, United States Code, Section 853(p).)

*United States v. Gregory J. Ziglar,* Criminal No. 4:19cr____

.....aant to the E-Government Act,
original of this page has been filed
under seal in the Clerk's Office.

A TRUE BILL:

_____

**F O R E P E R S O N**

G. Zachary Terwilliger
United States Attorney

By:

Brian J. Samuels
Assistant United States Attorney
Virginia State Bar No. 65898
Attorney for the United States
United States Attorney's Office
721 Lakefront Commons, Suite 300
Newport News, Virginia 23606
(757) 591-4000